Esteban González-Rodríguez et al., Plaintiffs and Appellees, *v.* Telesforo Fumero et al., Defendants and Appellants.

No. 4348.   Argued March 23, 1928.—Decided July 16, 1928.

*G. Zeno Sama* for the appellants.   *L. Mercader* for the appellees.

Mr. Justice Texidor delivered the opinion of the court.

The complaint in this case substantially alleged as follows:

Agustín González, father of the plaintiffs and of defendant Eufemia González, was the owner of a property of six acres in Sabana Hoyos, Arecibo, and of three other properties of five, ten and nineteen acres respectively in the same municipality and by deeds executed at different times and before different notaries he appeared as conveying these properties

to the defendants for various prices. It is alleged by the plaintiffs that in those conveyances or sales there was no real price nor receipt of money or effects nor any real and effective contractual consideration, but that the supposed conveyances were made because the plaintiffs had called the attention of their father, Agustín González, to the improper life that he was leading by keeping a mistress, whereupon their father became offended and left the house of the plaintiffs and went to live with the defendants and in conspiracy with them he executed the said simulated conveyances in order to deprive the plaintiffs of their interests in the future inheritance; that the defendants promised González to take care of his properties and have been appropriating to themselves the products on the strength of the supposed sales; that the defendants consolidated the properties of 5, 10 and 19 acres and the property so made up was joined later to the property of 6 acres, thus constituting a single property of 43 acres which they recorded in the registry of property; that Agustín González never ceased to be the owner of the aforesaid properties until his death in May of 1926, and since then the plaintiffs are the owners thereof in undivided common with their defendant sister to the extent of one-fourth each. It is alleged that the defendants have appropriated to themselves the products of the properties during four years to the amount of $2,400 and have encumbered them with a mortgage for $2,000 which they borrowed on that security and never shared with Agustín González or with the plaintiffs. Finally it is alleged that the conveyances were fraudulent, simulated and the result of a conspiracy between the defendants and Agustín González who alone continued after such conveyances to be the owner of the properties. On the strength of such allegations they prayed for judgment to the effect that the said conveyances are ineffective and void in law and that the plaintiffs are owners of one-fourth each of the said properties as legitimate children and heirs of Agustín González, as duly alleged, and that the defendants be ordered to pay

to the plaintiffs $3,300 as their part of the products and the money retained by the defendants.

The defendants admitted in their answer the death of Agustín González and the fact that the plaintiffs and defendant Eufemia were his legitimate children. As to the property of 6 acres, they denied the corresponding allegation and alleged that the defendant bought it from her father for $500 which the seller acknowledged having received prior to the execution of the deed. They denied the simulation and conspiracy in the other sales and alleged that the properties of 5 and 10 acres were sold by Agustín González to Fumero for $300 and $600 which the vendor acknowledged having received prior to the execution of the deed. They denied the simulated sale of the property of 19 acres and alleged that Agustín González sold it to Fumero for $1,450 which the vendor acknowledged having received prior to the execution of the deed. They denied the simulation and the conspiracy in the conveyances and alleged the existence of some real negotiation between the parties. They alleged that they had used the products of the properties as the owners thereof and denied the value of the products as alleged in the complaint. They denied any ownership in the plaintiffs of the properties mentioned. As a defense they alleged that Agustín González delivered to the defendants the properties which he sold to them; that they had recorded their ownership thereof in the registry of property by means of a proceeding for the conversion of the record of possession into a record of ownership and had mortgaged the consolidated properties to the Federal Land Bank of Baltimore for $2,000, and that the action brought by the plaintiffs had prescribed by virtue of section 1268 of the Civil Code. They prayed for dismissal of the complaint.

The case was tried in the District Court of Arecibo and both parties introduced parole and documentary evidence in

support of their contentions. On March 23, 1927, the court rendered judgment in favor of the plaintiffs. This appeal was taken from that judgment.

The appellants assign six errors which we shall consider by grouping those which by their nature should be so considered.

We shall not make a study of the errors assigned without a previous examination of the facts proved in order to determine the law applicable to them.

We have read the stenographic record and understand that the district court made a just, wise and careful weighing of the evidence, following undoubtedly the rules of evidence acknowledged and consecrated by our Law of Evidence which in its section 4 prescribes that moral certainty only is required, or that degree of proof which produces conviction in an unprejudiced mind, and section 99 wherein inference is defined and founded on facts legally proved and deductions therefrom warranted by a consideration of the usual propensities or passions of men, the course of business, etc. In weighing the evidence the trial judge had in mind those rules and acted in accordance with the precepts of section 162 of the Law of Evidence in the exercise of a sound discretion and in subordination to the established rules.

Let us examine the facts. On pages 11, 12, 13 and 14 of his opinion the judge expresses himself as follows:

"About the middle of 1921 the defendants were living in the ward of Florida of Barceloneta where they had rented a farm. Owing to adverse financial conditions Fumero had to give up the farm and went to live with his wife at Riestra, a place in the ward of Sabana Hoyos of Arecibo, in the home of his brother Rosendo. While in Riestra Agustín González came to live with them on account of family quarrels with the plaintiffs in the house of one in which he was living. Three months later González and the defendants moved to a property of the former containing forty acres and situated in the same ward of Sabana Hoyos. There Fumero worked and his services were paid at one dollar per day, and later was taken as a partner on shares in planting several acres of the farm to cane. A

few days after going to live with Eufemia, González fell seriously ill and was attended by Dr. Vergne. In November of 1921 González was requested by Roses & Co. to pay an obligation of five hundred dollars. Defendant Fumero advised González to make a conveyance of some land so as to get a mortgage thereon and pay that obligation. On November 21, 1921, and by public deed duly recorded González conveyed to his daughter Eufemia González Rodríguez, married to Telesforo Fumero, a parcel of six acres which was segregated from the forty acres for $500 which he acknowledged to have received from the purchaser prior to the execution of the deed. Notwithstanding this statement, it appears from the testimony of Eufemia González that the payment had not been made as stated in the deed, but that it was in the afternoon of that very day that she paid him the money, and immediately she said that it was not on the same day, but ten or twelve days later, that is, in the first days of December, 1921. In a letter dated January 8, 1922, written by her to her sister Claudia in the Canary Islands she said that her father 'has been unable to pay even the doctor.' She testified that in December she paid the purchase price of $500 to González and the latter failed to pay Dr. Vergne's bill amounting only to $104.00, as will be seen later on, nor was the obligation to Roses & Co. paid. It is true that after this conveyance Fumero took steps in Arecibo and Manatí to get money by mortgaging that parcel but failed.

"Fumero then urged and induced González to convey the remainder of the property so that he might mortgage it to the Federal Bank and thus secure the money for the payment of the obligations to Roses & Co., Dr. Vergne and others. Fumero induced González, who was about ninety years old, to believe that the Bank would not make that kind of a contract with a person of such an advanced age. On May 25, 1922, and by public deed González conveyed to Telesforo Fumero the remainder of the property of 40 acres, that is, 34 acres, for $1,450 which he acknowledged to have received prior to the execution of the deed. This document was recorded as to 19 acres as the area appearing of record and its record was denied regarding the remaining 15 acres because they appeared recorded in favor of a third person. In view of the foregoing a new instrument was executed. On June 10, 1922, and by public deed duly recorded, González conveyed to Telesforo Fumero two parcels of 5 and 10 acres for $300 and $600 respectively, which amounts he acknowledged to have received prior to the execution of the deed. Notwithstanding the mention contained in these two deeds of the payment having been made, it appears from the testimony of Lorenzo Oliver, a wit-

ness for the defendants, that the indebtedness of González to Roses & Co., which in 1922 amounted to $510.15, was secured by González by certain personal notes, and that the debt was not paid until March 21, 1923, when it amounted with interest thereon to $558.28, by a check signed by Fumero, that is, shortly after the latter had mortgaged the property to the Federal Bank for $2,000; and it likewise appears from the testimony of Dr. Vergne, also a witness for the defendants, that his bill for professional services to González was not paid until April, 1923, that is, shortly after the property had been mortgaged by Fumero to the Federal Land Bank. In the same instrument Fumero consolidated those 15 acres with the 19 acres conveyed on May 25, 1922, and recorded them as a single property of 34 acres.

''During all these transactions González continued acting as the owner of the property and meeting the expenses of the home of his children, the defendants herein. The latter in 1922 brought proceedings for the conversion of the record of possession into a record of ownership regarding the properties of 6 and 34 acres.

''On December 9, 1922, by public deed these properties were consolidated into one property of 40 acres and so recorded in favor of the defendants. On March 10, 1923, they mortgaged that property to the Federal Land Bank of Baltimore for $2,000. With that money in his possession on the 21st of that same month and year Fumero paid the obligation to Roses & Co. amounting then to $558.28. On April 16 of the same year Fumero paid Dr. Vergne 'the sum of $60 on account and $10 to pay the nurse.' Although it is stated in that bill that the total thereof is $104.00 and that there is a balance due of $34.00, on April 28 Dr. Vergne made out a receipt to Fumero for '$204.00 as his fees for professional services to Agustín González.' Agustín González was taken ill with pneumonia in 1922. He continued living on the property which is the subject of this suit until May, 1926, when he died.''

We find that the facts are just as set forth by the trial judge. There is not the slightest sign of passion, prejudice or bias on the part of the trial judge. No error can be found in the weighing of the evidence which perhaps can not be really said to be contradictory. And this statement disposes of the errors assigned under numbers 2 and 3, which in our opinion are not errors.

The other assignments refer to the existence or absence of

consideration in the so-called sale contracts (first assignment); to the prescription of the action of nullity (fourth assignment); to the necessity of bringing first an action of nullity (fifth assignment), and to the incapacity of the plaintiffs to bring their action against the acts of their father, of whom they are heirs.

Simulation of contracts is alleged in the complaint, and a correct statement in regard to the existence of the contract itself is required before reaching any conclusion regarding revendication.

Simulation is something that affects alike two essential elements of the contract—consent and consideration. No wonder that it is so, since those two elements in contracts are very closely connected as the consideration is the driving and determining cause of consent, not only in the contractual field but in all the spheres of the civil law. No one consents unless the making up of his mind is preceded by the presence of a consideration, of a motive for consent. Hence any vice which invalidates or simply affects the consideration is reflected in the consent. It could be said that an illicit consent is preceded by an illicit consideration.

Commentator Sánchez Román in his treatise on the Civil Law has written the following:

"The point is that where the declaration or verbal statement of a contracting party conflicts with his real will his declaration may be termed conflicting or ambiguous. It is the former when one thing is desired and another declared; and it is the latter when the declaration is defective or obscure, regarding the expression of the will, but not opposed to the declared will. A distinction is also made in the case of contradictory statements between willful and malicious contradiction and involuntary and unconscious contradiction.

"The contradiction is willful where a thing is deliberately stated and another desired; a sale is stated, and what is really desired and done is to give. In the latter case we have the juridical vice known as simulation, which is the willful contradiction between the declaration and the declared will, to which applies the rule *plus valet quod agitur quam quod simulatur*. The contradiction is involuntary

where the contracting party unwillingly declares the opposite of his will." :4 Sánchez Román, Civil Law, Art. I, Chap. X, page 190.

And speaking of the consideration in contracts, in the same volume, Sánchez Román says:

"After all, an illicit consideration is as if it had no existence in law and therefore becomes void, producing consequently the result of vitiating the consent and invalidating the contract, as well as producing a repetition of the delivery or payment, when the mistake or injustice would only be on the part of the receiver of such payments or deliveries; but no repetition will follow if the mistake is made by both parties."

By the concurrence of the three essential requisites prescribed in section 1228 of our Civil Code (Article 1261 of of the Spanish Civil Code) the legal contract originates. The Code offers a form of exclusion by that section when it says:

"There is no contract unless the following requisites exist:"

The phrase "There is no contract" excludes from that juridical qualification everything outside of the concurrence of the three requisites. If one of them is missing the contract is not born and does not become real.

Referring to consent as the "meeting" of minds, Manresa says:

"The essence of consent is the agreement of the parties to that which must constitute the contract, the acceptance from one of the offer made by the other; it is the concurrence mentioned by the law of the thing and the cause which are to constitute the contract." Manresa, Spanish Civil Code, vol. 8, p. 648.

Mucius Scaevola in his Commentaries on the Spanish Civil Code, vol. 20, p. 585, says:

"This is the usual thing, the concurrence of wills, the simultaneous expression of the assent from two or more persons to the subject of the juridical nexus which they may desire to create. The contract is born from, or originates in, the meeting of the minds of the parties (since things come to life in law by the same process as in nature) and for the generation of a new being there is required

the meeting of two generative elements consisting, in contracts, in the wills 'of the parties."

In simulated contracts it is evident that there is a lack of consent and in general a lack of consideration. Then, as said by Manresa, it is the most evident case of a void contract.

The Supreme Court of Spain, in a judgment of November 30, 1909, 116 *Jurisprudencia Civil,* page 501 *et seq.,* expressed itself as follows:

"Taking into consideration the fact that a simulated contract can not be mistaken for a void or voidable contract, since simulation implies by its own nature the nonexistence of the contract which is the opposite to what happens with the latter wherein, admitting its reality and certainty, it becomes necessary to examine in order to determine the propriety of the nullity or rescission, and this examination is absolutely out of place as it implies a contradiction where the contract has not existed, since-from the nonexistence there can be derived no more juridical consequences than those necessarily derived from that very nonexistence, that is, those that ensue if the execution of the alleged contract had never been even intended.

"Arguing from these premises, as the *Audiencia* of Cáceres finds that the contracts in question had been simulated, that is, that they did not exist, having been simulated for the purpose of cheating by that means the grandchildren out of their rights which were claimed at the death of their grandmother María del Rosario Fernández de Aguilar y González, it is evident that no matter the degree of propriety of the trial court in declaring the rescission of the contracts sued on, as we must argue from the fact of the simulation or nonexistence thereof, as this was not attacked in the appeal, no application can be made of the rules and precepts bearing 'on the rescission and not even of those bearing on the nullity itself, but only of the consequences inferred by the court, which are, as has been stated, those bringing about the leading fact of the nonexistence, that is, that the property sued on never really left the possession of the alleged vendor, and therefore it formed part of the hereditary estate at her death."

In the case under consideration there were certain alleged contracts of purchase and sale for the real purpose of conveying to a person gratuitously property which in a future event might be considered as the hereditary estate from the grantor.

There was neither an actual conveyance of the properties nor a real and true consideration. From the deeds appeared the sale as well as the conveyance of title and the delivery of the purchase price. The fact was otherwise and at variance with the statements of the parties. Hence the simulation.

The citation made applies to the case before us because, independently of the declaration as regards the nonexistence of the contract by reason of the simulation, the juridical nature of the property is established as in the case before us, when it is said "that the property sued on never really left the possession of the alleged vendor, and therefore formed part of the hereditary estate at her death."

The evidence in the present case justifies the finding of the district court that there was no payment of the purchase price in the said contracts, and that the properties said to have been sold never ceased to belong to Agustín González who continued acting as their owner.

It is not sufficient to consider the general rules regarding the consent and the consideration. It is necessary to apply those rules to the contract of purchase and sale. In doing so in this archetype of consensual contracts we find that the contract requires, in conformity with section 1348 of the Civil Code, the obligation of one of the contracting parties to pay the price and of the other to deliver the thing sold. In the absence of these obligations, if there is no transfer of the thing by one of the contracting parties and payment by the other of the estimated value or price, there is no intention of delivering either of the two and there is not only an absence of consideration but also of consent.

Therefore, there was no contract in the cases complained of by the plaintiffs, and we are face to face with what Manresa terms a typical case of a void contract.

If the contract is void it is obvious, in accordance with the rules of law, that there can be no prescription. From the juridical point of view there is no ground justifying the

consideration of prescription, for, section 1267 of the Civil Code requires, in order to make them voidable, *contracts containing the requisites mentioned in section 1228,* although tainted with defect or vice. A vitiated consent may give rise to a contract, because there is the possibility of confirming the same and this cures the defect. But it is necessary that the consent has been real; a defective reality, but always a reality. There is no possibility of confirmation where there is lack of consent or of any of the other essential requisites of the contract. In the case before us, from whatever angle the question may be viewed, and whether there is lack of consent as a concurrence of wills for the contract of sale or whether there is no consideration, the contract is void because the act in question lacks the essential requisites for the creation of such a contract.

In *Oliver* v. *Oliver,* 23 P.R.R. 168, this court held as follows in regard to the lack of an essential requisite of the contract and its consequences:

"The 'consent of the contracting parties,' required by section 1228, is in either event entirely absent, and in the simple language of that section 'there is no contract.' There is nothing to be 'annulled,' within the meaning of section 1267, nothing upon which to base 'the action for nullity' referred to in section 1268."

The alleged errors assigned under Nos. 1 and 2 by the appellants are thus disposed of.

In fact the error assigned as the fourth refers only to prescription, though occasionally it refers to the existence of the consideration indicating that there is a contract. This manner of insisting on the existence of the contract shows that the appellants fully realize that it is only on that ground that they could plead prescription.

In order to void a contract which contains the necessary requisites for its existence (section 1267 of the Civil Code) the provisions of section 1268 of the same Code are given. But what is required is the existence of the contract derived from the concurrence of the elements contained in the provi-

sions of section 1228 without which "there is no contract." In the absence of such legal contract there is no room for the application of the provision for the prescription of actions. Such is the case of the nonexistence of the contract.

In *Oliver* v. *Oliver, supra,* it was said (end of the paragraph above quoted in this opinion):

". . . . It follows that the bar in question is no defense to an action for the reivindication of real estate so sold."

In *Succession of Suro* v. *Succession of Prado,* 21 P.R.R. 227, it was held by this court that—

"According to section 1267, the duration of the action of nullity referred to in the section quoted applies only to contracts having the requisites mentioned in section 1228 whenever they contain any of the defects which invalidate them according to law, which requisites are the consent of the contracting parties, a definite object which is the subject-matter of the contract, and a valuable consideration stated."

And further on it is said:

"Therefore, in deciding upon the validity or prescription of the action for the annulment of the deed of November 29, 1879, we must consider it as a fact admitted by both parties that Encarnación Prado executed the deed in her own right and as representative of the minor children of Juan Suro, not as the guardian *ad litem,* but as their mother with *patria potestas* over them. This being the case and as according to the law of *Partidas* in force at the date of the execution of the deed, the mother had no *patria potestas* over her minor children, this right pertaining exclusively to the father (Laws II and III, Title XVII, *Partida* 4), it follows as a logical consequence that the minor children of Juan Suro were not represented in the execution of the said deed nor took any part therein, hence they did not give their consent to the contract themselves or through a legal representative. Therefore, there was lacking the consent to the contract which should have been given by the legal representative of the minor children of Suro. It appears that no such representative existed inasmuch as their mother could not represent them because she was not their curatrix or guardian and exercised no *patria potestas* over them, and for want of this requisite the action to annul the contract cannot be governed by the provisions

of section 1268 of the Civil Code which, as we have said before, is applicable to contracts which contain all the requisites mentioned in section 1228.''

In *Cruz* v. *Heirs of Kuinlan,* 29 P.R.R. 817, this court said:

''The second assignment of error refers to a violation of section 1268 of the Civil Code.

''This section is included in the chapter of the Code treating of the nullity of contracts and provides that the action of nullity shall last only four years; and relying on it and also on the fact that the sale took place in the year 1910, the appellants allege that the action for the annulment of the sale is barred by limitation because brought after the lapse of four years.

''The limitation established in that section, according to the preceding section 1267, refers to contracts containing the requisites prescribed in section 1228, viz., those where there is consent, object and consideration, if they contain any of the defects which invalidate them according to law.''

In *Solá* v. *Castro,* 32 P.R.R. 740, this court has upheld in its entirety the doctrine laid down in *Oliver* v. *Oliver, supra.*

The legal basis of that doctrine is stated in the judgment of the Supreme Court of Spain of November 30, 1909, *supra.* The Supreme Court of Spain said:

''. . . . since from the nonexistence there can be derived no more juridical consequences than those necessarily derived from that very nonexistence, *that is, those that ensue if the execution of the alleged contract had never been even intended.''* (Italics ours.)

No consequences of that or of any other kind can be extracted from something which has never had juridical existence. In order to establish prescription a contract is needed, or a date or a time from which to start the computation of time. Therefore, the fourth error assigned is without merit.

The error assigned under number 5 was not committed.

The principle governing this matter has been repeatedly laid down by the constant jurisprudence of Porto Rico, especially in *Succession of Nieves* v. *Succession of Sánchez,* 17 P.R.R. 837; *Oliver* v. *Oliver,* 23 P.R.R. 168; *People* v.

*Heirs of Valdés,* 31 P.R.R. 213, and *Amy* v. *Heirs of Verges,* 33 P.R.R. 359.

When the plaintiff does not necessarily rest his cause of action on the nullity of the title of the defendant but on facts and causes other than such nullity, no application can be made of the rule of the previous prosecution of the action for nullity.

In *Oliver* v. *Oliver, supra,* this point was fully examined and the legal rule set forth above was upheld.

In *People* v. *Heirs of Valdés,* 31 P.R.R. 213, citation is made of *People* v. *Dimas,* 18 P.R.R. 1019, where this Supreme Court laid down the doctrine in this respect as follows:

"The legal principle that when an action of ejectment is brought against persons in possession of the thing in controversy on the strength 'of a title which was thought to be valid, it is necessary that the nullity of this title be first asked for, is applicable only when the action arises from such nullity, but not when the right to bring an action of ejectment is independent thereof. (Opinions of the Supreme Court of Spain of October 16, 1873; January 17, 1889; April 6, 1889, and February 13, 1892.)"

The decision in the case of *People* v. *Heirs of Valdés* confirms this doctrine. In *Amy* v. *Heirs of Verges, supra,* the established legal doctrine was confirmed.

In *Succn. of Nieves* v. *Succn. of Sánchez* the opinions delivered by Associate Justices del Toro and Wolf laid down the same doctrine, citing the judgment of the Supreme Court of Spain referred to in *People* v. *Dimas.*

In these cases of simulated sales and for the purposes of the action brought it is indispensable to bear in mind what the Supreme Court of Spain said in its opinion of November 30, 1909, as follows:

". . . . but only the consequences deduced by the court itself and which are, as has been stated, those bringing about the leading fact of the nonexistence, that is, that the property sued on never

really left the possession of the alleged vendor and, therefore, it formed part of the hereditary estate at her death.''

Therefore, the title of the plaintiffs is their hereditary right, while there is no title in the defendants, since the non-existence of the contract is a bar to the creation of any title whatever.

Therefore, the error assigned in number 5 was not committed.

Error is assigned on the ground that the complaint was sustained notwithstanding the fact that the defendants were estopped from bringing the action because they were the heirs and continuers of the personality of their father, and can not repudiate their own acts.

This rule is not applicable in all cases. In the case of acts which create rights and obligations which have legal force, the law, as a protection of the legitimate or legal status which is created thereby, bars the action of those who committed them in order to prevent them from controverting them in their effects and consequences. But this is done on the basis of the existence of a legal status where truth and legality are to be found as essential elements.

The Supreme Court of Spain in a judgment of July 13, 1892, said:

''. . . . that the principle that our own acts can not be impeached presupposes that the acts invoked as constituting an exception have a juridical meaning and effect opposed to the intended action. . . . .''

In a judgment of March 10, 1890, the same Supreme Court of Spain said:

''The principle according to which nobody can validly impeach his own acts refers to those acts which, as the expression of consent, are carried out for the purpose of creating, modifying or extinguishing some right.''

Such circumstances do not prevail in cases of simulation

of contracts, which do not create, modify or extinguish any right or produce any effect.

In a judgment of April 24, 1895, the Supreme Court of Spain held that it does not do to urge the doctrine that no one can impeach his own acts where the alleged objectionable act lacks binding effect. In another judgment of the same Supreme Court of December 7, 1896, it was stated that the acts which the law does not allow to be impeached by those who have executed them or by their universal heirs are those which by reason of their far-reaching character, or because they constitute an agreement, produce a legal status, defining in an inalterable manner the juridical situation of their author.

As there is no contract in the present case and as no right whatever has been created by the simulated deeds in question, it can not be held that the district court erred as alleged in the sixth assignment.

We have still to consider the third assignment of error.

It is unnecessary to cite decisions. They are so many and have so often established the doctrine that, except in cases showing passion, prejudice, partiality or manifest error in the weighing of the evidence by the court *a quo,* this Supreme Court will not disturb or modify the findings, that there is no justification for undertaking such a long task.

The District Court of Arecibo weighed the evidence wisely and logically and from such standards of judicial conduct there has been born the accuracy with which the evidence was weighed and considered in the present case. The court weighed the evidence as a whole and drew from the probatory elements the facts which could and should be accepted as the result of a sound judgment.

The third assignment has no merit.

For the foregoing reasons the judgment appealed from must be affirmed.